941 A.2d 1181

**COUNTY COMMISSIONERS FOR CARROLL COUNTY, Maryland,**

v.

**FORTY WEST BUILDERS, INC., et al.**

No. 1531, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Feb. 11, 2008.

**332**

Kenneth R. West and Stanley D. Abrams (James L. Parsons on the brief), Bethesda, for Appellant.

Anthony P. Palagigos (Thomas A. Bowden on the brief), Timonium, Clark R. Shaffer on the brief, Westminster, for Appellee.

Panel: HOLLANDER, BARBERA, CHARLES E. MOYLAN, JR., (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This matter is before us for the second time, and concerns two contiguous residential subdivision projects: Eagles Crest and Ridgewood Estates, both located near Mt. Airy in Carroll County (the "Projects"). Harrison Farm, LLC ("Harrison") and Ridgewood, LLC ("Ridgewood"), appellees, hold title to the real property upon which the Projects were to be built by the developer, Forty West Builders, Inc. ("Forty West"), appellee.[1]

The County Commissioners for Carroll County, appellant (hereafter the "County," the "Board," or the "Commissioners"), challenge an Order issued by the Circuit Court for Carroll County on October 17, 2005.[2] Among other things, the Order enjoined the County from applying to the Projects an adequate public facilities ordinance enacted in 2004, because in December 2002 the County had granted a Concurrency Management Certificate ("CMC") for each project, pursuant to an earlier and less stringent adequate public facilities ordinance.[3]

---

1. Unless otherwise noted, we shall refer to appellees collectively as "Forty West."

2. The caption of appellant's brief identifies appellant as "County Commissioners for Carroll County, Maryland." In its brief, however, appellant is identified as "the Board of County Commissioners for Carroll County."

3. Section 167–2 of the Carroll County Code defined a Concurrency Management Certificate as follows:

A written determination, based on the database and annual report required by this chapter, that available threshold capacity and other requirements of this chapter are met for a proposed project; and a reservation of housing allocations for the scheduled completion years of the project. If the project is covered by a phasing agreement, the

The court also found the County in constructive contempt of its November 2003 order, in which the court had granted Forty West preliminary injunctive relief.

Appellant presents three issues on appeal, which we quote:

1. Whether the trial court erred or abused its discretion when it found the County to be in constructive contempt of the November 13, 2003 Order.

2. Whether the trial court erred in granting injunctive relief to Forty West based on a finding contained in its grant of partial summary judgment that the CMC constitutes a contractual obligation.

3. Whether the trial court lacked jurisdiction over Forty West's claims based upon Forty West's failure to exhaust its administrative remedies.

For the reasons that follow, we shall affirm the finding of contempt and the court's order granting additional injunctive relief, and remand for further proceedings.

## I. THE LEGISLATIVE SCHEMES

We begin with an overview of the relevant provisions of the Maryland Code ("Code") and the Carroll County Code (the "County Code").

■■■ Boards of county commissioners constitute the governing bodies of the counties of the state, such as Carroll County, that have not adopted home rule under Article XI–A (the "Home Rule Amendment") of the Maryland Constitution. *See* Maryland Code (1957, 2005 Repl.Vol.), Art. 25. A board of county commissioners functions as the county government and "is the county body politic; in performing its various functions, it exercises legislative, quasi-legislative, executive, and quasi-judicial authority, sometimes in combination." *Queen Anne's Conservation, Inc. v. County Comm'rs Of Queen Anne's County,* 382 Md. 306, 323, 855 A.2d 325 (2004) (citation

agreement and any amendments to it constitute a material condition of the concurrency management certificate.

omitted). The county commissioners sometimes wear "different hats," by which they "perform[ ] a legislative action followed by an administrative/executive action." *Id.* at 326, 855 A.2d 325.

Maryland Code, Article 25 sets forth the nature and powers of county commissioners and the manner of exercising their powers. *Casey v. Mayor and City Council of Rockville,* 400 Md. 259, 280, 929 A.2d 74 (2007). These powers pertain to matters such as road and bridge construction, land drainage, and public watershed associations. They are supplemented elsewhere in the Code, notably here by Article 66B, pertaining to land use.

Maryland Code, Article 66B, commonly known as the "enabling act," *Congressional School of Aeronautics, Inc. v. State Roads Comm'n,* 218 Md. 236, 244, 146 A.2d 558 (1958); 58 Op. Att'y Gen'l 521, 522 (1973), "generally regulates land use (planning and zoning) in Maryland's non-charter, Code home rule counties, Baltimore City, and municipalities possessing planning and zoning powers[.]" *Queen Anne's Conservation,* 382 Md. at 308–09 n. 1, 855 A.2d 325.[4] However, Article 66B, § 10.01(a)(1) permits any local jurisdiction to enact ordinances "to facilitate orderly development and growth ...," and to enact "ordinances or laws providing for or requiring ... adequate public facilities...."

Section 52 of the County Code provides for the creation, jurisdiction, powers and duties of the Planning and Zoning Commission of Carroll County (the "Planning Commission"). Pursuant to § 52–5, the Planning Commission "shall have all the powers, functions and duties as provided in Article 66B of the Annotated Code of Maryland, as amended."

---

4. The "planning and zoning powers exercised by charter counties in Maryland flow from Article 25A, § 5(x) of the Maryland Code...." *Queen Anne's Conservation,* 382 Md. at 320, 855 A.2d 325. Code home rule counties fall within the purview of Article 25B of the Maryland Code. *Id.* As noted, Carroll County is not a code home rule or charter county.

On March 5, 1998, the County adopted Ordinance No. 161, entitled "Public Facilities and Concurrency Management," codified as Chapter 167 of the County Code. The stated aim of Chapter 167 was to "permit[ ] planned residential growth to proceed at a rate that will not unduly strain public facilities, especially schools, roads, water, and sewer facilities, and police, fire and emergency medical services." County Code, § 167–1.A.

Chapter 167 required a developer to apply for a CMC at the outset of the development process. County Code, § 167–6.A, titled "Concurrency Management approval," provided:

> No development project subject to this chapter may be approved by the Board of County Commissioners, the Planning and Zoning Commission, the Board of Zoning Appeals, or any other county official having the authority to grant approval, until the project has satisfied the requirements of this chapter and a concurrency management certificate has been issued by the Department of Planning.[5]

To obtain a CMC, the developer had to submit "a concept plan ... and a concurrency data form containing sufficient information for the county to determine the impact of the proposed project on public facilities." County Code, § 167–6.G.(1). In particular, the developer had to show that the proposed project satisfied various "threshold" requirements as to school capacity; road capacity; availability of fire, police, and emergency medical services; and water and sewer services. County Code, § 167–5.C. With regard to school capacity under Chapter 167, the developer had to demonstrate that "[p]rojected enrollment at schools servicing a proposed project was at 120% or less of the state-rated capacity." County Code, § 167–5.C.(1)(a).

---

5. As appellant explains it, the CMC "functioned as a written staff determination that there were adequate County public facilities to support the proposed project." In their brief, appellees assert that the "purpose of Chapter 167 was to determine the availability of public facilities for a specified project before the developer expended large amounts of money to purchase land and pay for development costs and engineering to test infrastructure feasibility."

A developer who received a CMC was permitted to "proceed with recording and development, as long as the developer [met] specified milestones, dates by which certain stages must be completed." County Code, § 167–1.B. Put another way, "milestones" are deadlines "by which a developer must submit the next stage of a project to the Department of Planning for approval." County Code, § 167–2.[6] If "available threshold capacity" ("ATC") did not exist at the concept plan stage, the project was to be "assigned a place in a queue." County Code, § 167–1.C. Of import here, § 167–6.E stated: "Once a project has received a concurrency management certificate, no further approval for adequate facilities and services will be required for the project if the project is completed in accordance with its milestones." County Code, at § 167–6.E. Moreover, § 167–6.G(7) provided:

Any person aggrieved by a decision of the county denying a concurrency management certificate in whole or in part and alleging this chapter has been erroneously applied may appeal to the Board of Zoning Appeals. Any further appeal shall be to the Circuit Court.

Effective June 10, 2003, the County enacted Ordinance No. 03–11 (the "Deferral Ordinance"). It mandated a twelve-month deferral of the "submittal, acceptance, review, processing and approval of all ... residential subdivisions ... and site plans for residential development ... except for those plans approved by the Planning and Zoning Commission prior to the effective date [of June 10, 2003.]"

On April 22, 2004, the County enacted Ordinance No. 04–13, which repealed Chapter 167 and replaced it with Chapter 71, titled "Adequate Public Facilities and Concurrency Management." It states, in part:

**§ 71–5. Adequacy approval.**

---

**6.** Under County Code § 167–6.F, "failure to meet a milestone shall not result in expiration of a concurrency management certificate in any case where failure to meet a particular milestone was caused by acts or omissions of the county."

A. ATC ["Available Threshold Capacity" or "ATC"] is required for all years in the current six-year CIP ["Capital Improvement Program" or "CIP"].

B. No project may be approved by the Commission if a public facility or service is inadequate or projected to be inadequate during the current CIP, unless a relief facility is planned to address the inadequacy or the developer provides mitigation acceptable to the County. No residential plat may be recorded or final residential site plan approved until a relief facility planned to address the inadequacy in the current CIP has been completed and is operational or the developer provides mitigation acceptable to the County.

C. For projects that received preliminary approval by the Commission after March 5, 1998, and prior to April 22, 2004, the developer shall submit the project to the Commission for issuance of a recordation schedule and building permit reservations. For projects that received preliminary approval by the Commission prior to March 5, 1998, the project shall be tested for adequacy when final plan approval is sought pursuant to § 71–6E.

D. Threshold requirements.

(1) Adequacy.

(a) Schools. An elementary or high school servicing a proposed project is adequate, for the purposes of this chapter, when projected enrollment equals or is less than 109% of the state-rated capacity. A middle school serving a proposed project is adequate, for the purposes of this chapter, when projected enrollment equals or is less than 109% of the functional capacity. . . .

\* \* \*

(2) Approaching inadequacy.

(a) Schools. An elementary school serving a proposed project is approaching inadequate, for the purposes of this chapter, when projected enrollment is 110% to

119% of the state-rated capacity. A middle school serving a proposed project is approaching inadequate, for the purposes of this chapter, when projected enrollment is 110% to 119% of the functional capacity. A high school serving a proposed project is approaching inadequate, for the purposes of this chapter, when projected enrollment is 110% to 119% of the state-rated capacity....

\* \* \*

(3) Inadequacy.

 (a) Schools. An elementary school serving a proposed project is inadequate, for the purposes for this chapter, when projected enrollment exceeds 120% of the state-rated capacity. A middle school serving a proposed project is inadequate, for the purposes of this chapter, when projected enrollment exceeds 120% of the functional capacity. A high school serving a proposed project is inadequate, for the purposes of this chapter, when projected enrollment exceeds 120% of the state-rated capacity....

\* \* \*

## § 71–6. Approval process.

A. No development project subject to this chapter may be approved by the Commission until the project has satisfied the requirements of this chapter.

B. Any permit or approval obtained in violation of this chapter is void.

C. Concept process.

 (1) A concept concurrency application for a residential subdivision or other project subject to this chapter shall be submitted when a concept plan, pursuant to Chapter 103, is submitted to the Department. The application shall contain....

\* \* \*

D. Preliminary process.

(1) A preliminary concurrency application for a residential subdivision or other project subject to this chapter shall be submitted when a preliminary plan, pursuant to Chapter 103, is submitted to the Department [of Planning]. The application shall contain. . . .

(2) Distribution and review.

(a) After all review agency comments have been addressed and the Department has determined that the preliminary plan may be presented to the Commission, the Department shall distribute the ATC form and preliminary plan to the appropriate agencies for review and comment.

\* \* \*

(4) Planning and Zoning Commission adequacy determination.

(a) Denial. If a public facility or service is inadequate or projected to be inadequate during the current CIP at the preliminary plan stage and no relief facility is planned in the six-year CIP to address the inadequacy or no mitigation is accepted by the County pursuant to § 71–5B, the plan shall be denied by the Commission. At the request of the developer, the plan may be placed in a queue and re-tested on an annual basis.

(b) Conditional approval. If a public facility or service is inadequate and a relief facility is planned in the six-year CIP to address the inadequacy or mitigation is accepted by the County pursuant to § 71–5B, or a public facility or service is approaching inadequate during the current CIP, the Commission may conditionally approve the plan to proceed to the final plan stage and issue a tentative recordation schedule and tentative building permit reservations, subject to modification at the final plan stage.

 (c) Approval. If all public facilities and services are adequate during the current CIP, the Commission may approve the plan to proceed to the final plan stage and issue a recordation schedule and building permit reservations, subject to a building permit cap adopted by the Board of County Commissioners in effect at the time of applications for building permits.

 (5) For projects released from a queue, the project will be re-tested as to the facility or service which was inadequate or projected to be inadequate, in accordance with this subsection D.

E. Final process.

 (1) A final concurrency application for a residential subdivision or other project subject to this chapter shall be submitted when a final plat or site plan, pursuant to Chapter 103, is submitted to the Department. The application shall contain:

 (a) The number of units, type of units, and gross density of the proposed project;

 (b) The location of the proposed project;

 (c) Identification of the public facilities impacted by the proposed project;

* * *

 (e) For a site plan, a traffic impact study for roads and intersections completed in accordance with the traffic impact study guidelines. . . .

 (2) Distribution and review:

 (a) After all review agency comments have been addressed and the Department has determined that the final plan may be presented to the Commission, the Department shall distribute the ATC form and final plan to the appropriate agencies for review and comment.

 (b) Upon receipt of all applicable agency comments and ATC forms, the Department shall review the pro-

posed project for ATC and compliance with this chapter.

(c) If no response is received from any applicable agency within 30 days of the date the Department distributes the ATC form, the ATC shall be presumed adequate for the particular facility or service for which no response was received.

(d) No final plan may be presented to the Commission until the written report is prepared pursuant to paragraph (3).

(e) The final plan may not be withdrawn from the Commission agenda by the developer after the distribution of the ATC form. The final plan shall be presented to the Commission for adequacy approval.

(3) The Department shall forward a written report to the Commission including a recommendation as to whether adequacy approval should be granted and the following information:

(a) The number and type of units the proposed project would generate;

(b) The specific public facilities impacted by the proposed project;

(c) The extent of impact of the proposed project;

(d) The availability of ATC to serve the proposed project during the scheduled completion year and all remaining years in the existing CIP;

(e) The demand on existing and planned public facilities and services from all existing and approved development in the proposed project's applicable service area or district, including lots or projects not subject to this chapter, as follows:

[1] Existing lots and subdivisions, including residential units which have been approved by the Commission, in the impact area;

[2] All residential building permits proposed or projected in the impact area for the six-year CIP period. . . .

(f) If any existing facilities or services are inadequate, whether any facilities or services are planned in the CIP or budget that would alleviate the inadequacy, including the year in which the facilities or services are projected to be completed and operational and the extent to which they would alleviate the inadequacy.

(4) Planning and Zoning Commission adequacy determination.

(a) Denial. If a public facility or service is inadequate or projected to be inadequate during the current CIP at the final plan stage and no relief facility is planned in the six-year CIP to address the inadequacy or no mitigation is accepted by the County pursuant to § 71–5B, the plan shall be denied by the Commission. At the developer's request, the plan may be placed in a queue and re-tested on an annual basis.

(b) Conditional approval. If a public facility or service is inadequate or approaching inadequate and a relief facility is planned in the six-year CIP to address the inadequacy or mitigation is subject to a phasing plan for recordation or may defer the project and place the plan in a queue to be re-tested on an annual basis.

(c) Approval. If adequacy was not determined by the Commission at the preliminary plan stage and the Commission determines that all public facilities and services are adequate, the Commission may approve the plan and issue a recordation schedule and building permit reservations.

(d) For projects that received a conditional approval and tentative recordation schedule at the preliminary plan stage, the Commission shall review the facility

or service which was inadequate or approaching inadequate at the preliminary plan stage and may modify the recordation schedule and building permit reservations or place the project in a queue, at the discretion of the Commission.

(e) For projects that received a recordation schedule and building permit reservations at the preliminary plan stage, the Commission shall inform the developer whether any existing or proposed building permit cap would be applicable to the project.

## II. FACTUAL AND PROCEDURAL SUMMARY

On or about October 3, 2002, Forty West submitted concept plans and applications for CMCs to the County for two proposed subdivisions: a 70–lot project to be called Eagles Crest, and a 61–lot project to be called Ridgewood Estates. Forty West paid development review fees to the County for the Projects in the amounts of $8,869 and $8,122, respectively.

The County issued CMCs for the Projects, which bear the date of November 22, 2002. The CMCs were signed by Forty West as the developer on December 10, 2002, and by Jeanne S. Joiner, the Director of the County Department of Planning, on behalf of the Commissioners, on December 17, 2002. The word "(SEAL)" appears next to each signature.

At the relevant time, the CMC was a two-page form document. In general, it identified the name of the housing project; the total number of building lots; the years in which building lots were allocated; milestone dates; and the dates by which plats were to be recorded. The document also contained an acknowledgment that the requirements of the Concurrency Management Law ("CML") were met for the particular project. Notably, it conditioned issuance of building permits on the developer/owner satisfying all requirements of the CML and all other applicable laws and agreements between the developer/owner and the County.

Both CMCs at issue here contain almost identical language. As to Eagles Crest, for example, it said, in part:

I hereby certify that the requirements of the Carroll County Adequate Public Facilities and Concurrency Management Ordinance (Chapter 167 . . .) have been met for the above project.

The County will issue building permits for the subdivision known as "Eagles Crest," according to the following schedule, provided that the Developer/Owner meets all requirements of Chapter 167, Code of Public Local Laws and Ordinances for Carroll County, all other applicable laws, and all agreements between the Developer/Owner and the County.

By the terms of the CMCs at issue here, during fiscal years 2005, 2006, and 2007 Forty West was to satisfy certain "milestones" before the County would issue building permits for the Projects.[7] As a prerequisite to the issuance of any building permits, Forty West was required to submit a "Preliminary Plan Package Submittal Milestone" by June 8, 2003. In addition, the County would issue the first fifty permits, for fiscal year 2005, only if Forty West submitted a "Final Plat Package Submittal Milestone" by March 1, 2005, and a "Date of Recordation of Milestone" by May 8, 2005.

By letters dated December 10, 2002 (for Ridgewood Estates) and December 18, 2002 (for Eagles Crest), Clayton Black, of the Bureau of Development Review (the "Bureau"), wrote to Stephen Costello at Forty West, enclosing the completed CMC. Each letter warned: "Please note that a failure to meet these milestone dates will result in the cancellation of your certificate and a new application will need to be filed. Extensions of these dates can not be granted."

On April 24, 2003, Steven C. Horn, the Director of the County Department of Planning, issued a "Special Report to the Board of Carroll County Commissioners" (the "Special Report"). It stated, in pertinent part:

---

7. According to the CMCs, Eagles Crest was to receive building permits for 25 lots in 2005, 25 lots in 2006, and 20 lots in 2007; Ridgewood was to receive building permits for 25 lots in 2005, 25 lots in 2006, and 11 lots in 2007.

## Concurrency Management

Aside from the fact that implementation of the Ordinance [Chapter 167] has proven to be complex, data intensive, and difficult to track, Concurrency Management is "fixable". Inconsistent implementation, due to lack of staff comprehension and inadequate resources, has given credence to the notion that the best solution is to "scrap" Concurrency Management and proceed with the establishment of a new adequate facilities ordinance. Staff submits that addressing the following shortcomings in the Ordinance would result in a more effective growth management tool while sparing the County the time and expense of starting from scratch on the creation of a new adequate facilities ordinance.

**1. Make Concurrency responsive to countywide growth.**

Currently, the Ordinance does not apply in the municipalities, therefore, implementation of a countywide growth management tool is problematic....

**3. Test for adequacy at Preliminary Plan Stage of development process.**

Typically, the ATC is set at the concept plan stage. The problem with the single test at concept plan stage is the County issues the Concurrency Certificate based on the concept plan. *The Certificate acts like a "contract" with the developer, and by its issuance, the County agrees that the project can move forward to completion—irrespective of the possibility that public facilities may become inadequate before the project is ready for recordation.* Additional adequacy testing must consider investments made by developers in preparing preliminary plans.

(Emphasis added.)

According to the Special Report, the resolution of these problems was expected to "be complicated and time consuming," and those individuals studying the problem needed "to complete the task without the added pressure of ongoing subdivision plan review." Therefore, it recommended "a tem-

porary deferral on the processing of unapproved plans (plans not yet approved by PZC)" i.e., the Planning and Zoning Commission, and "on the acceptance of new subdivision plans that are subject to the Concurrency Management Ordinance." The Special Report continued:

The deferral is recommended to extend for up to 12 months, thereby allowing the referenced Committees and County staff ample time to undertake the analyses and corrective actions referenced herein. The 12 month deferral period is a temporary measure to prevent land development that may be inconsistent with proposed or pending changes. Without this deferral, we may artificially create a rush to submit and process subdivision plans (to develop and achieve vested rights) and encourage speculative land development in anticipation of contemplated changes to the referenced ordinances.

Following issuance of the CMCs, Forty West began engineering work, percolation testing, and street traffic studies in order to meet the first milestone of June 8, 2003, for preliminary plan package submittal. In order to finance the purchase of the properties and to continue development efforts, Forty West borrowed $6,981,250 on May 2, 2003, secured by a Deed of Trust. Then, on May 9, 2003, Harrison Farm, LLC obtained ownership from Edward H. Harrison of the 91–acre parcel to be developed as the Eagles Crest subdivision, for the sum of $3,587,726.63. On the same date, for the sum of $4,444,212.36, Ridgewood LLC acquired the 153–acre parcel from Mt. Airy Farm LLP. It was to be developed as Ridgewood Estates. Through August 20, 2003, appellants incurred development costs, excluding the cost of the land, but including site engineering, traffic studies, percolation testing, and governmental fees, of approximately $480,000.

On May 19, 2003 (i.e., prior to the June 8, 2003 milestone set forth in the CMCs), Forty West submitted preliminary plans for the Projects to the Bureau, and paid review fees to the County of $9,650.20 for Eagles Crest and $9,527.84 for Ridgewood Estates. In letters dated May 30, 2003, the Bureau acknowledged that the plans were "accepted for distribution to

the appropriate review agencies," and that comments would be presented at a Subdivision Advisory Committee ("SAC") meeting, tentatively scheduled for June 27, 2003. Further, it advised that the developer and engineers "should be available at the meeting to discuss any issues relative to the project."

However, on June 5, 2003, the County adopted the Deferral Ordinance, effective June 10, 2003; it mandated a twelve-month deferral of all projects then under review. On June 12, 2003, Horn advised Forty West that the Deferral Ordinance applied to the Projects, stating that "all processing of the[ ] plans will cease as of June 10, 2003." Horn continued:

> The Bureau of Development Review will retain all plans and associated fees, unless the applicant requests the return of the fees and the plans. Fees will not be released until a request to withdraw your application from the process is received and a form is signed requesting such action. The County Attorney is currently drafting the required form.
>
> The County recognizes that you may be unable to meet the milestones in the Concurrency Management Certificate due to an act or omission of the County in adopting Ordinance 03–11. You will not be required to meet any milestone during the deferral period and a determination of the process will be made in the later stages of this deferral.

Harrison and Ridgewood asked the Board for exemptions from the Deferral Ordinance. In connection with both Ridgewood Estates and Eagles Crest, the Board held hearings in August of 2003. The Commissioners denied each request in a "Decision" issued on September 25, 2003. The rulings are largely the same. As to Eagles Crest, it stated:

> On August 21, 2003, the County Commissioners of Carroll County, Maryland ("the Commissioners"), held a public hearing on the request of Harrison Farm, LLC and Forty West Builders, Inc. for an exemption from the Residential Development Deferral pursuant to Article I(vi)(6)(b) of Ordinance No. 03–11 for its project known as "Eagles Crest." Article I(vi)(6)(b) allows residential projects to apply for an

exemption that have been or are presently the subject of a municipal annexation petition.

In order to grant a request for an exemption from the deferral, the Board must consider evidence of at least the following three minimum factors: whether there is substantial hardship to the owner or developer if the project is not allowed to proceed during the deferral period; whether adequate public facilities exist in the area where the project is located; and in the case of an inadequate public facility or service, whether the developer proposes and agrees to provide relief facilities or services prior to the use and occupancy of the project.

With respect to the request at issue, based on the evidence and testimony presented at the public hearing, as well as the Special Report to the Board from the Department of Planning, we make the following findings and conclusions of law:

The proposed project ("Eagles Crest") is located on the northeast corner of the Maryland Route 27 and Watersville Road intersection and as proposed will consist of approximately 70 units. The project was the subject of a Town of Mount Airy municipal annexation petition, originally received by the Town in December of 2001. The annexation petition was scheduled for a public hearing before the Town Planning and Zoning Commission, but the petition was withdrawn on October 3, 2002 before the hearing. The developer voluntarily withdrew the project because of economic concerns related to the limited number of lots the Town would approve and the costs of required infrastructure. The property has not been the subject of an annexation petition since that time.

As for water and sewer service, the project will be served by on-site private well and septic facilities. As to emergency services, the project will be served by the Mount Airy Volunteer Fire Department, Inc. Deputy Chief Douglas C. Alexander reviewed the request and expressed concerns regarding the adequacy of emergency services for this proposed subdivision; although, he indicated the Depart-

ment was not against the request exemption. The Town of Mount Airy opposed the request for exemption because of ongoing concerns about adequate facilities within the Town.

As to adequacy of schools, Mr. David Reeve from the Board of Education (BOE) responded that the Mount Airy Middle School will exceed functional capacity before the anticipated opening of a relief facility in August of 2008. The units in the proposed subdivision will begin to be brought on-line in 2005 further straining the capacity at the Middle School. According to BOE criteria, a school becomes "inadequate" when pupil enrollment exceeds 110% of the functional capacity of the facility, and adequacy standards for schools are a key issue reviewed during the development deferral period. Enrollment projections for the Middle School are currently 122% of functional capacity and will rise to 134% in 2007–2008. The Middle School has also been used as a temporary relief facility at the elementary school, which currently exceeds capacity and will continue to do so until the new Parr's Ridge Elementary school is open and available in 2005. The applicant has offered no relief for inadequacy. Because of the "inadequate" findings by the BOE, we find no compelling reason to allow this project to proceed during the deferral period.

Although the applicant provided information regarding substantial hardship at the public hearing, we do not find the information compelling enough to grant the exemption especially in light of the Middle School inadequacy and the failure of the applicant to provide any relief for the inadequacy.

**NOW, THEREFORE,** this 25th day of September, 2003, the request for exemption is hereby **DENIED.**[8]

---

8. In connection with Ridgewood Estates, only the descriptive paragraph differed; both Decisions were issued on the same date. The Ridgewood Estates Decision stated:

> The proposed project ("Ridgewood Estates") is located east of Maryland Rule 27 at Leishear Road and as proposed will consist of approximately 61 units. The project was the subject of a Town of Mount Airy municipal annexation petition, originally received by the

Forty West appealed the Board's decision to the Carroll County Board of Zoning Appeals (the "Zoning Board") (Case Nos. 4821 and 4822). Following a public hearing on August 26, 2003, the Zoning Board issued its decisions on October 7, 2003. It declined to review the legality of the Deferral Ordinance, or to require the Planning Commission to continue processing the plans for Eagles Crest and Ridgewood Estates. Forty West then sought review in the Circuit Court for Carroll County on November 5, 2003, which affirmed. Thereafter, Forty West appealed to this Court. In a consolidated appeal involving 17 cases, including *Harrison Farm, LLC and Ridgewood, LLC. v. County Commissioners of Carroll County*, Nos. 1435 and 1432, September Term, 2004 (*"Forty West I "*), this Court affirmed on April 20, 2005.

The Court reasoned that the "Board is empowered to review administrative decisions only, not legislative decisions." *Forty West I,* slip op. at 7. Further, we stated:

[T]he Ordinance was a legislative act that applied to appellants' projects by its terms. The Department of Planning was not asked to make an administrative determination with respect to a particular property or properties. The Department of Planning simply acknowledged the scope and effect of the Ordinance as applicable to all properties subject to its terms. In other words, there was no administrative determination that could be appealed to the Board. The challenge by appellants was a direct challenge to the legislative act of enacting the Ordinance.

Notably, the *Forty West I* Court added:

For the above reasons, the Board lacked jurisdiction. We expressly decide no other issue. In the event actions are now filed invoking the general jurisdiction of the circuit

Town in December of 2001. The annexation petition was scheduled for a public hearing before the Town Planning and Zoning Commission, but the petition was withdrawn on October 3, 200 before the hearing. The developer voluntarily withdrew the project because of economic concerns related to the limited number of lots the Town would approve and the costs of required infrastructure. The property has not been the subject of an annexation petition since that time.

court, the court, upon request, may, in its discretion, decide whether to stay such actions, and any presently pending actions, *until the ultimate resolution of the administrative process.*

*Forty West I,* slip op. at 7–8 (emphasis added).

In the interim, on October 9, 2003, while appellants pursued their challenge to the Deferral Ordinance, Forty West filed in the circuit court a "Verified Complaint" against the County Commissioners, asserting claims for breach of contract, anticipatory breach of contract, and equitable estoppel.[9] Forty West sought various forms of relief, including a writ of mandamus or an injunction requiring the County to "[i]mmediately resume and continue its review and approval process pertaining to [the Projects'] development plan packages in the ordinary course, without requiring any further approvals for adequate facilities and services, as long as the projects are completed in accordance with their milestones." Forty West also asked the Court to extend the milestones "for a period of time equal to the number of days between June 10, 2003 and the date on which review and processing resumes on [the Projects.]" Moreover, it requested compensatory damages and a declaratory judgment adjudicating "the rights and liabilities of the parties with respect to the Concurrency Management Certificates . . . ." On the same day, Forty West filed a "Motion for Preliminary Injunction," requesting the court to issue a preliminary injunction requiring the County "to resume the processing of development plans for the projects known as Eagles Crest and Ridgewood Estates without requiring further approvals for public facilities and services."

The County filed an opposition, in which it asserted that the CMCs were not contracts and, even if they were, they had not been breached. Therefore, the County argued that it was "not estopped from executing its authority." It also filed a motion to dismiss the request for preliminary injunction,

---

9. The record does not include any of the pleadings from the inception of litigation until May of 2004. The "Verified Complaint" is included in the record extract, however.

claiming that the court lacked subject matter jurisdiction because Forty West had no statutory right to an appeal from the denial of its exemption request, and because Forty West had failed to exhaust its administrative remedies.

At an evidentiary hearing on October 29, 2003, Steven Costello, Forty West's President and a member of Ridgeway and Harrison, testified that, in reliance on the County's issuance of the CMCs, Forty West incurred substantial expenses, as outlined above, in order to complete the preliminary plan submissions due on June 8, 2003. He added that, if the County had not issued the CMCs, Forty West would not have acquired the real property on which the subdivisions were to be built.[10] In light of the Deferral Ordinance, Costello expressed concern that the County would "initiate new and stringent guidelines and other checkpoints that [would] make it harder or impossible for [Forty West] to develop." His concern was based on "statements in the paper from Mr. Horn stating that new regulations would probably be enacted and they would be retroactive to plans that are already in the County now."

Forty West also introduced a slide presentation that the County's Director of Planning showed to prospective home-builders regarding the Chapter 167 CMC process. A slide in that presentation, entitled "HOUSING ALLOCATION," provided: "A housing allocation reserves a developer the right to receive a building permit in that fiscal year."

The court issued a Memorandum Opinion and Order on November 12,2003 (entered November 13, 2003), in which it granted the developer's application for preliminary injunction (the "November 2003 Injunction"). The court found that: (1) Forty West was likely to succeed on the merits; (2) greater

---

**10.** While Costello noted that the CMCs envisioned a total of 131 buildable lots for the two subdivisions, he acknowledged that physical characteristics of the real property might result in a few lots not being approved for construction by the County. Costello did not believe, however, that the lots would be subject to any additional testing for adequate public facilities.

injury would be done to Forty West than the County in the absence of injunctive relief; (3) Forty West would suffer irreparable harm if development review were halted; and (4) the public interest would suffer "no measurable damage[.]" Therefore, it ordered the Board to "resume the development review and approval process" as to both Projects and to extend the milestones in both CMCs. In particular, the court revised the milestone dates by adding 156 days to account for the time period that elapsed between the date the moratorium commenced, June 10, 2003, and the date the court issued the injunction.[11]

In reaching its conclusions, the court reasoned:

*1. The Likelihood That [Forty West] Will Succeed On the Merits*

[Forty West] allege[s] the Concurrency Management Certificates are contracts, and that the [County] is in breach of those contracts.

[Forty West] and the [County] executed under seal two Concurrency Management Certificates. Both Certificates contained identical language, e.g., that the requirements of the Concurrency Management Ordinance "have been made for the above project" and that the "County will issue building permits" according to the schedule set forth in each Certificate provided that the developer meets all legal requirements. The Certificates bear the indicia of contracts, including mutual executory promises and the signatures of all parties under seal.

In reliance upon the agreements set forth in the two Certificates, Harrison Farm LLC and Ridgewood LLC promptly purchased the land for Eagles Crest and Ridgewood Estates.... The companies also incurred initial development costs to stay on track so as to achieve the milestones contained in the Certificates....

---

**11.** The court also required Forty West to post a $100,000 bond, pursuant to Md. Rule 15–503(a).

*2. Balance of Convenience—Whether Greater Injury Would Be Done to Defendant by Granting Injunction Than Would Result From Its Refusal*

By granting the injunction, the County Department of Planning will have to process [Forty West's] subdivision plan[s] (and potentially all those subdivision plans that have received a Concurrency Management Certificate) while the Growth Management Task Force focuses on what is wrong with the practice of land development in Carroll County and presents those recommendations to the Board. The Court recognizes that addressing these problems will be time consuming and complicated for the Growth Management Task Force and that it would be ideal if the Task Force could conduct its review of land development in the county without dealing with ongoing subdivision plan review. However, the Court finds that greater injury would be done to [Forty West] if the injunction were not granted. Also, the Court notes that [Forty West] will not receive building permits until Fiscal Year 2005, and the Court will in all likelihood decide this matter on the merits before construction of Eagles Crest or Ridgewood Estates begins.

*3. Whether [Forty West] Will Suffer Irreparable Injury*

[Forty West is] seeking the continuation of processing of [its] subdivision plans without the imposition of additional adequate public facilities requirements. [Forty West] allege[s] that because Ordinance 03–11 does not defer residential developments in Carroll County's municipalities, where a large percentage of residential growth is anticipated, it is likely that during the deferral period [Forty West's] projects will lose any competitive advantage.

\* \* \*

Stephen H. Costello, President of Forty West, testified at the preliminary injunction hearing that he borrowed $6,981,250.00 from The Columbia Bank to purchase the properties and that the bank holds a promissory note dated May 9, 2003, that provides that the principal shall be due and payable June 1,2005. The promissory note also pro-

vides that interest on the principal shall be paid monthly commencing on the first day of the first month following the date of the promissory note.

The Court finds that there is a likelihood that [Forty West] will prevail on the merits, and therefore, the possibility that [Forty West's] subdivision projects will suffer irreparable harm due to the County's decision to continue processing the plans of Carroll County's municipalities will suffice for satisfaction of this factor.

### 4. *The Public Interest*

The public interest will suffer no measurable damage by the granting of this injunction, pending a hearing on the merits. [Forty West] will not be eligible for a building permit until 2005 and, therefore, should [the County] prevail at a hearing on the merits, none of the residences will have been constructed.

The County noted an appeal as to the November 2003 Injunction. On its own initiative, the Court of Appeals issued a writ of certiorari in three consolidated cases, including *Board of County Commissioners for Carroll County v. Forty West Builders, Inc.* See *Board of County Commissioner for Carroll County v. John W. Pfaff Builders, Inc.*, 380 Md. 617, 846 A.2d 401 (2004) (per curiam). However, on December 3, 2004, the Court dismissed the appeals as moot. *Board of County Commissioners for Carroll County v. John W. Pfaff Builders, Inc.*, 384 Md. 22, 862 A.2d 404 (2004). The Court explained that it granted certiorari to consider the validity of County Ordinance No. 03–11, which "imposed a one-year moratorium on the processing of residential development plans," *id.* at 23, 862 A.2d 404, but "the moratorium had expired and was not renewed." *Id.* Thus, the Court said: "The issue we took the cases to decide is therefore moot, and there is no indication that it is likely to recur in any kind of similar factual setting, as the basis for the moratorium has, itself, been dealt with by subsequent county legislation." *Id.*

As noted, on April 22, 2004, while the appeal from the November 2003 Injunction was pending, the County enacted

Ordinance No. 04–13, which repealed Chapter 167 and enacted Chapter 71.[12] By letter of May 13, 2004, the County informed Forty West of the adoption of Ordinance No. 04–13, stating:

> The adoption of these ordinances may have a direct impact on your proposed subdivision plans as compliance with each ordinance is required. We would encourage you to contact us to discuss this at your earliest convenience or have our engineer or surveyor make the necessary corrections to bring the plans into compliance.
>
> Please call for an appointment to discuss your plans or let us know your intentions on how you will be addressing this matter. . . .

By letters dated May 21, 2004, Forty West's counsel informed the County that Forty West "challeng[ed] the County's right to impose any new or revised adequate public facilities criteria to the . . . project[s]."[13] Forty West indicated that the circuit court had "issued an injunction requiring the County . . . to continue the development review and approval process" for the Projects. Appellees' counsel continued: "I therefore categorically reject your assertion that compliance with the new adequate public facilities ordinance is required." Moreover, Forty West warned that "the threat of applying the standards contained in the new ordinance to the . . . project[s], while [the County] is subject to the Circuit Court's injunction, places the County in contempt of court or dangerously close to it."

On May 26, 2004, Forty West filed a "Petition for Constructive Civil Contempt" and a "Motion for Additional Injunctive Relief." In its petition, Forty West alleged that by telephone on May 25, 2004, the County's attorney responded to appellees' letters of May 21, 2004, and the County advised: "(1) that the existing injunction [did] not prohibit the application of new

---

**12.** We previously set forth, at length, the terms of various provisions in Chapter 71.

**13.** The letters were identical save for the fact that one was prepared on behalf of Harrison Farm and the other for Ridgewood.

adequate public facilities criteria to Eagles Crest and Ridge-wood Estates, and (2) that the County intend[ed] to apply said criteria to the [Projects]." Therefore, Forty West asked the court to find the County in contempt of its November 2003 Injunction. In its motion, Forty West sought to enjoin the County from applying "any adequate facilities ordinances or criteria other than that which was in force and effect at the time the Concurrency Management Certificates were issued."

In its opposition to the contempt petition, the County argued that it was not precluded from enacting and applying new ordinances to the Projects. Moreover, it claimed that it did not violate the November 2003 Injunction because it had resumed the development review and approval process with Forty West. In its opposition to Forty West's motion, the County argued: (1) that the circuit court was "precluded from exercising its jurisdiction" because the issues raised by Forty West "involve the subject matter of the appeal currently before the Court of Appeals"; and, (2) under the separation of powers doctrine, the court lacked the power to grant injunctive relief that would prohibit the County "from applying a duly enacted County law."

The court held another evidentiary hearing on July 28, 2004. Costello testified that, immediately following the November 2003 Injunction, the County resumed the development review and approval process for the Projects. He recounted:

In December [2003], we had a SAC [Subdivision Advisory Commission] meeting, which is an open meeting to the public that all the reviewing agencies have a representative and to comment on the plans.

We then, in January of '04, had a meeting with Bruce Waldron [14] and many of the reviewers, with our engineers, to go over their comments and to get an understanding of—of where to go.

We then went back, started to revise the plans, turned them into the—the Health Department for—for our final

---

14. Waldron is a Development Review Coordinator for the County.

perking, which was—some of it was done in the wet weather season, which ended in April. Those results we just received two weeks ago.

We then formulated the final plans, you know, realigning the roads and lots . . . and we are no[w] finalizing the plan for resubmission in August this year.

Costello contended, however, that the Projects could not satisfy the Chapter 71 APF standards, if applied. Forty West then sought to demonstrate why its Projects could not survive the review process if the new APF standards were applied. In this regard, Forty West introduced the County Board of Education's school capacity projections.[15] The new APF standards for the Mt. Airy Middle School district provided that facilities are "inadequate" if they exceed 120% of functional capacity, and the County Board of Education report showed that projected enrollment in the Mt. Airy Middle School district from 2005 through 2013 exceeded 120% of functional capacity. Costello explained that adequate public facilities testing under Chapter 71 for middle schools "changed from a State-rated [capacity under Chapter 167] to a . . . functionally-rated capacity."

Waldron testified as to the County's efforts to comply with the November 2003 Injunction. He explained that after the Deferral Ordinance went into effect in June of 2003, processing of the Projects ceased. However, after the court issued the November 2003 Injunction, the County resumed the review process. It asked Forty West to submit plans that were reviewed at a December 2003 SAC meeting. Thereafter, the parties held a follow-up meeting to discuss comments that were made at the SAC meeting. The next step was for Forty West to submit revised plans, which his Department would "forward to the various agencies for review." As of the July

---

**15.** Although the County admitted that the school capacity projections had been "put on the street" by the County Board of Education, the County objected to the projections because the Board of Education had "not actually adopted its ten-year facilities master plan. . . ." The court overruled the objection.

2004 hearing, however, Forty West had not submitted the revised plans, so "there's not a lot for [the County] to do."

The court held the matter *sub curia,* pending the Court of Appeals's decision in the consolidated appeals concerning the ordinance imposing the one-year moratorium, *supra.* As indicated, on December 3, 2004, the Court of Appeals dismissed that appeal as moot.

On January 3, 2005, Forty West filed "Amendments by Interlineation to Verified Complaint," in which it sought to expand the scope of the lawsuit by alleging that the Projects could not qualify for planning commission approval after the enactment of Chapter 71. Claiming that "Application of the new Chapter 71 to [Forty West's] projects will probably cause them to be rejected," Forty West requested that the court:

Find and declare that [Forty West's] rights under the Concurrency Management Certificates ... survived the County's enactment of Ordinance 04–13 [i.e., Chapter 71], and that said Ordinance had no effect on the County's obligation to continue processing the Eagles Crest or Ridgewood Estates projects without further testing for adequate public facilities.

The County filed a "Motion to Dismiss or in the Alternative to Stay" on January 13, 2005. It asserted: (1) "The question whether Chapter 71 applies to [Forty West's] projects should be heard and decided by the Planning and Zoning Commission prior to any ruling" in the circuit court; (2) Forty West did not exhaust its administrative remedies before seeking relief in the circuit court; and (3) Forty West "failed to take advantage" of the time period between the issuance of the November 2003 Injunction and the adoption of Chapter 71 in April of 2004 to seek approval of the Projects. Moreover, the County alleged:

[C]onsideration of the application of Chapter 71 to [Forty West's] projects is not yet ripe. The various agencies have not yet approved [Forty West's] projects and such approval is a prerequisite for submission to the Planning and Zoning Commission. Only after a submission to the Commission

will the projects be tested for adequacy of public facilities. Assertions by [Forty West] as to whether or not their projects will satisfy adequacy requirements are sheer speculation.

Then, on May 20, 2005, Forty West filed a "Motion for Partial Summary Judgment," in which it asked the court to "rule, on the basis of undisputed facts, that the Concurrency Management Certificates were contracts," and thus the County was precluded from requiring any further approval for adequate public facilities, so long as the milestones were met. In the alternative, Forty West argued that "the County is estopped to impose more stringent facilities requirements by virtue of [Forty West's] reliance upon the Certificates and the County ordinance [Chapter 167] promising that no new standards would be imposed." In its opposition, the County denied that the CMCs are contracts. It also claimed that Forty West "failed to establish" that it is "entitled to judgment as a matter of law on the basis of estoppel[.]"

By "Memorandum Opinion and Order" dated October 17, 2005 (the "October 2005 Order"), the circuit court denied the County's motion to dismiss and granted Forty West's motion for partial summary judgment. As to the motion for partial summary judgment, the court said:

> This Court granted [Forty West's] Application for Preliminary Injunction based, *inter alia,* on this Court's finding that [Forty West was] likely to prevail on the issue that the Concurrency Management Certificates obtained by [Forty West] were contracts or acted like contracts, and the imposition of the deferral by [the County] amounted to a breach of contract.

> [Forty West] and the [County] executed under seal two Concurrency Management Certificates. Both Certificates contain identical language, e.g., that the requirements of the Concurrency Management Ordinance "have been made for the above project" and that the "County will issue building permits" according to the schedule set forth in each Certificate provided that the developer meets all legal require-

ments. The Certificates bear the indicia of contracts, including mutual executory promises and the signatures of all parties under seal. *See, Venners v. Goldberg,* 133 Md.App. 428, 758 A.2d 567 (2000). In *Selig v. State Highway Administration,* 383 Md. 655, 677, 861 A.2d 710 (2004), the Court held that once a party enters into a contract valid under the statute at the time of execution, subsequent statutes, generally, cannot impair the operation of those contracts.

 In reliance upon the agreements set forth in the two Certificates, Harrison Farm LLC and Ridgewood LLC promptly purchased the land for Eagles Crest and Ridgewood Estates. . . . The companies also incurred initial development costs to stay on track so as to achieve the milestones contained in the Certificates. . . .

The Court finds that there is no genuine issue of material fact as to whether [the] Concurrency Management Certificates . . . constitute a contractual obligation.

Regarding the County's motion to dismiss, the court reasoned:

[The County] filed their [sic] Motion on the basis of [Forty West's] failure to exhaust administrative remedies citing two recent Maryland Court of Appeals decisions, *Maryland Recreation [Reclamation] Associates, Inc. v. Harford County,* 382 Md. 348, 855 A.2d 351 (2004) and *City of Bowie v. Prince George's County Planning Board,* 384 Md. 413, 863 A.2d 976 (2005) [2006]. [Forty West] allege[s it] has no administrative remedy to pursue. The Court of Special Appeals of Maryland in an opinion dated April 20, 2005, agreed with this Court that the Board of Zoning Appeals does not have jurisdiction to rule on the validity of the deferral ordinance. There is no point in staying these proceedings until such time as the Planning and Zoning Commission has issued an opinion as to the applicability of Chapter 71 to [Forty West's] projects, when [Forty West has] a vested contractual interest in applying Chapter 167 of

the Carroll County Code, the law in effect at the time the Concurrency Management Certificates were issued.

Therefore, the court ruled:

ORDERED, that the Defendant's Motion To Dismiss Or, In the Alternative, To Stay be, and it hereby is, denied; and it is further;

ORDERED, that Plaintiff's Motion for Partial Summary Judgment be, and it hereby is, granted; and it is further

ORDERED, that Concurrency Management Certificate No. P–02–44 (Ridgewood Estates) constitutes a contractual obligation precluding the Board of County Commissioners of Carroll County, the Carroll County Planning Commission, or any agencies hereof from requiring any further approval for adequate public facilities, as long as the project is completed in accordance with its milestones, as amended by this Court's prior order granting injunctive relies; and it is further

ORDERED, that Concurrency Management Certificate No. P–02–43 (Eagles Crest) constitutes a contractual obligation precluding the Board of County Commissioners of Carroll County, the Carroll County Planning Commission, or any agencies thereof from requiring any further approval for adequate public facilities, as long as the project is completed in accordance with its milestones, as amended by this Court's prior order granting injunctive relief; and it is further

ORDERED, that [Forty West's] Petition for Constructive Contempt be, and it hereby is, granted and the County can purge itself of contempt by continuing to process Ridgewood Estates and Eagles Crest under Chapter 167 . . ., the law in effect at the time . . . the Concurrency Management Certificates for both projects were issued; and it is further

ORDERED, that [Forty West's] Motion for Additional Injunctive Relief be, and it hereby is, granted; and it is further

ORDERED, that the Board of County Commissioners be, and it hereby is, enjoined from applying to Eagles Crest

and Ridgewood Estates any adequate public facilities ordinances or criteria other than that which was in force and effect at the time the Concurrency Management Certificates were issued.

Within ten days, both parties filed motions to alter or amend, pursuant to Md. Rule 2–534. Because the October 2005 Order was not issued until seventeen months after Forty West made its original request for relief, and fifteen months after the July 2004 hearing, Forty West's motion requested that "each milestone in the Concurrency Management Certificates be further extended by 387 days beyond the extensions ordered in November 2003." The County asked the court to vacate its finding of constructive contempt, and to amend the October 2005 Order by addressing Forty West's alleged failure to comply with the milestones, as amended by the November 2003 Injunction.

The court entertained the motions to alter or amend at a hearing held on June 8, 2006.[16] By "Order" of August 17, 2006, the court granted Forty West's motion and extended the CMC milestones "387 days beyond the 156–day extension" ordered by the November 2003 Injunction. On August 28, 2006, the court issued an "Order" denying the County's motion to alter or amend.

Because of the additional delay between Forty West's original request for relief on filed on October 26, 2005, and the court's eventual grant of relief on August 17, 2006, Forty West filed a "Motion to Alter or Amend Court's Order of August 17, 2006" on August 28, 2006. It asked the court to:

(a) Extend the milestone dates under Chapter 167 for a minimum of twenty-one months from [June 8, 2006] but require the County to process Forty West's plans under all the laws that existed at the time of the issuance of the Concurrency Management Certificates (and not just Chapter 167) to which milestone dates apply or

---

16. In its brief, the County asserts that the hearing occurred in July of 2006. The transcript of the hearing and the docket indicate that it occurred on June 8, 2006.

(b) Reaffirm the October 2005 Order that requires there be no additional requirements to test for adequate public facilities for the reasons cited therein and if [any "of the new development, subdivision and adequate public facilities ordinances, rules, regulations and procedures adopted by the County in and after 2004"] are to be applied to Forty West's projects then there shall be no milestone dates established inasmuch as none exist under [the new ordinances, rules, regulations and procedures adopted in or after 2004].

The County filed an opposition. The court has not yet ruled on this motion.

On September 8, 2006, the County noted an appeal from the circuit court's Order of October 17, 2005, and the Order of August 17, 2006.

## III. DISCUSSION

### A.

The County appeals three rulings of the circuit court made in October 2005: the finding that the County was in constructive civil contempt of its Order of November 13, 2003, and could purge itself by continuing to process the Projects under Chapter 167; the grant of additional injunctive relief to Forty West; and the grant of partial summary judgment to Forty West. The County claims, *inter alia*, that the court erred when it premised these rulings on its "conclusion that the [CMCs] are or act like contracts."

Preliminarily, Forty West claims that the appeal is premature, "because the circuit court is still considering whether to grant Forty West's [August 28, 2006] Rule 2–534 motion to extend the development milestones or, in the alternative, delete the milestone requirements altogether." [17] It adds: "The circuit court's ruling on this motion could render irrele-

---

17. Forty West also suggests that it filed a "motion to stay processing of appeal," but we were unable to locate the motion in the record.

vant or moot the parties' arguments concerning the additional interlocutory injunctive relief at issue here." Therefore, it urges this Court to "delay processing of the appeal until the withdrawal or disposal of the pending motion." In addition, Forty West insists that there is no statutory basis for an appeal of the partial summary judgment order because it is interlocutory.

The County argues that the finding of contempt and the issuance of the preliminary injunction are interlocutory orders that are immediately appealable. Moreover, it maintains that the underlying determination that the CMCs are contracts is also reviewable, because the trial court's conclusion to that effect was the basis on which the court found the County in constructive contempt and granted injunctive relief, enjoining the County from applying any APF ordinance to the Projects, "other than that which was in force and effect" when the CMCs were issued. Appellant adds: "The correlation is clear: the reason why the court granted the additional injunctive relief was because it decided that the CMCs were contracts." [18]

Even if we proceed with consideration of the appeal, Forty West contends that we need not decide whether CMCs are contracts. Rather, it urges us to confine our attention to whether the circuit court "abused its discretion in finding that the CMC-contract argument—or any of the other legal arguments in support of Forty West's claim—is likely to succeed on the merits." Forty West continues:

> Section 12–303(3)(i) [of the Courts and Judicial Proceedings Article] does not authorize a frantic leap to the Court of Special Appeals every time the circuit court enters an order supplying an additional *reason* for a prior grant of injunctive relief not challenged on appeal. Only the injunctive

---

**18.** Appellant concedes that the trial court's October 2005 Order "did not provide specific reasons as to why that additional injunctive relief was necessary." But, appellant maintains that the court precluded the County from requiring any further APF approvals for the Projects because the CMCs "constitute a contractual obligation."

relief itself may be appealed. [ ] There is nothing in the October 2005 order forging any necessary link between the CMC-contract finding and either the extension of milestones or the finding of contempt. Similarly, the statute authorizing immediate [appeal] of a contempt finding, Md.Code Ann., Cts. & Jud. Proc. § 12–304, does not permit appeals of other, unrelated interlocutory orders such as one granting partial summary judgment.

█ Ordinarily, an appeal must be taken from a final judgment entered in the trial court in order for an appellate court to obtain jurisdiction. *See* Md.Code (1974, 2006 Repl. Vol), § 12–301 of the Courts and Judicial Proceedings Article ("C.J."); *see Silbersack v. AC and S, Inc.*, 402 Md. 673, 678, 938 A.2d 855 (2008) ("[T]here is a long-standing bedrock rule of appellate jurisdiction, practice, and procedure that, unless otherwise provided by law, the right to seek appellate review . . . ordinarily must await the entry of a final judgment that disposes of all claims against all parties."); *see also Hudson v. Housing Authority of Baltimore City*, 402 Md. 18, 24, 935 A.2d 395 (2007); *County Com'rs for St. Mary's County v. Lacer*, 393 Md. 415, 424, 903 A.2d 378 (2006); *Taha v. Southern Mgmt. Corp.*, 367 Md. 564, 567, 790 A.2d 11 (2002); *O'Brien v. O'Brien*, 367 Md. 547, 554, 790 A.2d 1 (2002); Md. Rule 2–601. In the usual course, absent a final judgment, we may not reach the merits of an appeal. *O'Brien*, 367 Md. at 554, 790 A.2d 1; *see Jenkins v. Jenkins*, 112 Md.App. 390, 399, 685 A.2d 817 (1996) ("The longstanding rule in this State deems the existence of a final judgment as a jurisdictional fact prerequisite to the viability of an appeal."), *cert. denied*, 344 Md. 718, 690 A.2d 524 (1997). There is no final judgment here; the court only granted partial summary judgment to Forty West.

█ Nevertheless, under Maryland law, there are three delineated exceptions to the requirement that an appeal must be taken from a final judgment: (1) appeals from interlocutory

rulings specifically allowed by C.J. §§ 12–303 and 12–304; [19] (2) immediate appeals permitted under Maryland Rule 2–602(b); [20] and (3) appeals from interlocutory rulings allowed under the common law collateral order doctrine. *Hudson,* 402 Md. at 24, 935 A.2d 395; *Lacer,* 393 Md. at 424–25, 903 A.2d 378; *Salvagno v. Frew,* 388 Md. 605, 615, 881 A.2d 660 (2005); *Addison v. State,* 173 Md.App. 138, 153, 917 A.2d 1200(2007).

As noted, the October 2005 Order granted Forty West's motion for additional injunctive relief. C.J. § 12–303(3)(i) permits a party to appeal an order "[g]ranting or dissolving an injunction," so long as the appellant "filed his answer in the cause[.]" [21] Moreover, the court determined in its October 2005 Order that the County was in constructive contempt of its November 2003 Order. That ruling is appealable under C.J. § 12–304(a), which provides, subject to an exception not relevant here, that a party "may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him in contempt of court, including an interlocutory order, remedial in nature, adjudging a person in contempt, whether or not a party to the action." *See Bryant v. Howard County Dep't of Social Services,* 387 Md. 30, 45, 874 A.2d 457 (2005) (reiterating that a finding of contempt, even without the immediate imposition of punishment or sanction, is appealable because a finding of contempt leaves "the defendant adjudged to have wilfully violated a court order and may well leave the defendant subject to future punishment at the will of the court.") *See also Unnamed Atty. v. Attorney Grievance Comm'n,* 303

---

**19.** C.J. § 12–303 is captioned "Appeals from certain interlocutory orders," and contains numerous categories, such as "[g]ranting a petition to stay arbitration...." C.J. § 12–303(3)(ix). C.J. § 12–304 is captioned "Appeals in contempt cases."

**20.** Rule 2–602 is titled "Judgments not disposing of entire action." It permits the circuit court to order entry of a judgment as to fewer than all claims or parties if the court expressly determines in a written order that "there is no just reason for delay."

**21.** Appellant filed the requisite answer.

Md. 473, 483, 494 A.2d 940 (1985) ("A contempt proceeding, even though it may grow out of or be associated with another proceeding, is ordinarily regarded as a collateral or separate action from the underlying case and as separately appealable, with appellate review normally limited to the contempt order itself.")

Here, the court issued its contempt finding and its grant of injunctive relief as part of an omnibus Memorandum Opinion and Order in which it granted Forty West's motion for partial summary judgment. All three rulings were predicated on the circuit court's finding that the CMCs constituted contractual obligations. Because that determination was the basis for the contempt finding and the injunction, which are appealable interlocutory orders, we are satisfied that the CMC-contract issue is properly before us. If we were to adopt Forty West's position—that the contract issue is not before us—we would be barred from reviewing an appealable interlocutory order merely because the circuit court issued such an order contemporaneous with a non-appealable interlocutory order (*i.e.*, the grant of partial summary judgment). The statutes that empower us to review interlocutory injunctions and contempt findings do not limit our authority in the way suggested by Forty West.

## B.

As indicated, the CMCs were issued by the County and provided, in part:

> I hereby certify that the requirements of the Carroll County Adequate Public Facilities and Concurrency Management Ordinance (Chapter 167 ... ) have been met for the above project.

> The County will issue building permits for the subdivision known as "Eagles Crest," according to the following schedule, provided that the Developer/Owner meets all requirements of Chapter 167, Code of Public Local Laws and Ordinances for Carroll County, all other applicable laws,

and all agreements between the Developer/Owner and the County.[22]

Appellant argues that the CMCs are not contracts and do not function as such. First, appellant contends that the CMCs did not contain language specific enough to create contracts. Second, appellant argues that, to the extent the County made promises in the CMCs, these promises were not supported by consideration. In addition, appellant contends that they were not validly executed, in accordance with Code, Article 66B, § 13.01, *et. seq.*

Forty West insists that the CMCs are contracts, in which appellant promised that approval of Forty West's Projects would be governed by the APF ordinance that existed at the time the CMCs were issued. It contends that, to the extent appellant changed its APF law, these changes would not apply to the Projects.

Forty West's position is rooted in its concern that its Projects cannot meet the new Chapter 71 standards, which increased the threshold required for certain services to be deemed "adequate." According to Forty West,

> Whereas the previous ordinance required that a project satisfy APF standards only once (prior to issuance of a CMC), after which "no further approval for adequate facilities and services will be required" (§ 167–6.E . . .) the new Chapter 71 imposes *five separate stages* of review:
>
> • An initial, "tentative" determination by the Department of Planning (§ 71–6.C(2) . . .);

---

**22.** The Ridgewood Estates CMC does not vary in any material respect. As we explained, the CMCs provided that Forty West was to satisfy a schedule of milestones before the County would issue building permits. In order for the County to issue building permits for fiscal year 2005, Forty West was required to submit a "Preliminary Plan Package Submittal Milestone" on June 8, 2003; a "Final Plat Package Submittal Milestone" on March 3, 2005; and a "Date of Recordation of Milestone" was to occur on May 8, 2005. The milestones for fiscal years 2006 and 2007, with the exception of the "Preliminary Plan Package," which was only required once, were approximately one and two years after the fiscal year 2005 milestones.

- An initial "recommendation" by the Department of Planning (§ 71–6.D(3) ...);

- An initial "adequacy determination" by the Planning and Zoning Commission (§ 71–6.D(4) ...);

- A final "recommendation" by the Department of Planning (§ 71–6.E(3) ...); and

- A final "adequacy determination" by the Planning and Zoning Commission (§ 71–6.E(4) ...).

Forty West also points out that, unlike its predecessor, Chapter 71 does not provide for an appeal to the Board of Zoning Appeals with respect to the denial of a CMC. Moreover, Chapter 71 includes multiple stages of APF review, but does not provide for the milestones that were a feature of Chapter 167. Forty West asserts:

- Under the former law, public facilities were either adequate or not. However, under the new law, a new category has been created, called "approaching inadequacy," with lower thresholds of inadequacy, and any project falling in that category can be denied approval, modified, or stalled. (§ 71–5.D(2), Apx. 32).

- Under the prior law, school capacity was adequate so long as projected enrollment would be 120% or less of "state-rated" capacity. (E. 472; § 167–5.C(1)(a), Apx. 5). Under the new law, however, elementary and high schools are "approaching inadequacy" when projected enrollment is 110% to 119% of state-rated capacity. (§ 71–5.D(2)(a), Apx. 32). Moreover, middle schools are "approaching inadequacy" when projected enrollment is 110% to 119% of *functional* capacity, and "inadequate" at levels of 120% or more of *functional* capacity. (E. 472; § 71–5.D(2)(a),(3)(a), Apx. 32).

- If public facilities are deemed inadequate or approaching inadequacy, the County can impose a "phasing schedule" lessening the number of building permits issued each year for development projects. (§§ 71–2, 71–6.E(4)(d), Apx. 28, 38).

- Under the new law, the County declared its intent to grant no more than an average of 6,000 building permits per year during any six-year period. (§ 71–4.B, Apx.30). However, the County mandates that building permits issued by municipalities not subject to the County's ordinances "shall be included" in computing the average. *Id.*[23] This is a departure from prior practice and will reduce the number of building permits issued by the County.

■ Before reviewing the parties' contentions in greater detail, we pause to review the basic principles of contract law. A contract has been defined as " 'a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' " *Kiley v. First Nat'l Bank of Md.,* 102 Md.App. 317, 333, 649 A.2d 1145 (1994) (quoting Richard A. Lord, 1 WILLISTON ON CONTRACTS, § 1:1, at 2–3 (4th ed.1990)), *cert. denied,* 338 Md. 116, 656 A.2d 772, *cert. denied,* 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995).

■ The interpretation of a written contract is generally a question of law for the court, subject to *de novo* review. *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250, 768 A.2d 620 (2001); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 341, 731 A.2d 441 (1999). We utilize the law of objective interpretation to ascertain the intent of the contracting parties, provided that intention does not violate an established principle of law. *B & P Enter. v. Overland Equip. Co.,* 133 Md.App. 583, 604, 758 A.2d 1026 (2000); *Ragin v. Porter Hayden Co.,* 133 Md.App. 116, 135, 754 A.2d 503 (2000). In Maryland, " 'the primary source for determining the intention of the parties is the language of the contract itself.' " *8621 Limited Partnership v. LDG, Inc.,* 169 Md.App. 214, 226, 900 A.2d 259 (2006) (quoting *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 290–91, 674 A.2d 106, *aff'd,* 346 Md. 122, 695 A.2d 153 (1997)).

---

**23.** Chapter 71 does not limit the issuance of building permits for projects within the boundaries of Carroll County's incorporated municipalities. *Id.* at § 71–4.F.

When the language of a contract "is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Wells*, 363 Md. at 251, 768 A.2d 620; *see PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029 (2001). Moreover, " '[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.' " *Labor Ready, Inc. v. Abis*, 137 Md.App. 116, 128, 767 A.2d 936 (2001) (citation omitted). Language in a contract can be "ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person." *Maslow v. Vanguri*, 168 Md.App. at 319, 896 A.2d 408 (2006). "To determine whether a contract is susceptible of more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.' " *Id.* (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985)).

The question of whether a contract was formed is central to this appeal. "A contract is formed when an unrevoked offer made by one person is accepted by another." *Prince George's County v. Silverman*, 58 Md.App. 41, 57, 472 A.2d 104(1984). An essential element with respect to the formation of a contract is " 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.' " *Safeway Stores, Inc. v. Altman*, 296 Md. 486, 489, 463 A.2d 829 (1983) (citation omitted); *see Kiley, supra*, 102 Md.App. at 333, 649 A.2d 1145. Thus, the validity of a contract depends upon the "two prerequisites of mutual assent ... namely, an offer and an acceptance." 3 Eric M. Holmes, Holmes's Appleman on Insurance 2D, § 11.1, at 93 (1998) ("Appleman").

It is equally well established that an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations. *Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866 (1974); *see Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (1950);

*Reiser Co. v. Baltimore Radio Show, Inc.*, 169 Md. 306, 312, 181 A. 465 (1935). Put another way, " '[a] court cannot enforce a contract unless it can determine what it is.' " *See First Nat'l Bank of Md. v. Burton, Parsons & Co., Inc.*, 57 Md.App. 437, 450, 470 A.2d 822, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984) (quoting 1 CORBIN ON CONTRACTS § 95). If the contract omits an important term or is too vague with respect to essential terms, the contract may be invalid. *L & L Corp. v. Ammendale Normal Institute*, 248 Md. 380, 385, 236 A.2d 734 (1968); *see Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287 (1957) (a "contract may be so vague and uncertain as to price or amount as to be unenforceable."); *Maslow*, 168 Md.App. at 322, 896 A.2d 408. "Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract." Joseph M. Perillo, 1 CORBIN ON CONTRACTS § 4.1, at 525 (rev. ed.1993) (hereinafter "Corbin"); *See* Restatement (Second) Contracts, *supra*, § 33(1), at 92 ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.").

In *Robinson, supra*, 196 Md. 213, 76 A.2d 354, the Court explained the requirement of contractual certainty:

Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce

it, may be able to know the purpose and intention of the parties.

*Id.* at 217, 76 A.2d 354 (citations omitted).

"In construing a contract, each clause must be given effect if reasonably possible." *Arundel Fed. Sav. & Loan Ass'n v. Lawrence,* 65 Md.App. 158, 165, 499 A.2d 1298 (1985). "[C]ourts are reluctant to reject an agreement, regularly and fairly made, as unintelligible or insensible." *Quillen v. Kelley,* 216 Md. 396, 407, 140 A.2d 517 (1958). Because the "law does not favor, but leans against the destruction of contracts because of uncertainty[,] . . . courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained." *Id.* Nevertheless, "a mere expression of intention to do an act is not an offer to do it, and a general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." *Maryland Supreme Corp. v. Blake Co.,* 279 Md. 531, 539, 369 A.2d 1017 (1977).

## C.

In appellant's view, the CMCs lacked the "requisite definiteness and certainty to express the nature and extent of the parties['] and particularly the Board's obligations." Moreover, appellant maintains that neither CMC contained "the essential terms of a contract" within its four corners. It explains:

> [T]he CMC failed to place any obligation whatsoever on the County to even process Forty West's projects by a date or time certain. The CMC did not include provisions or language that reflected intent by the Board to confer a vested right to housing allocations or a guarantee of preliminary subdivision approval by the Commission of the same number of lots as the housing allocation.

Forty West responds that the CMCs "are or function as contracts between Forty West and the County. They bear the indicia of contracts, including mutual executory promises

and the signature of all parties under seal." It insists that the County regards CMCs as contracts, stating:

> Sec. 167–6.E of the County Code States: "Once a project has received a concurrency management certificate, *no further approval for adequate facilities and services will be required* for the project if the project is completed in accordance with its milestones." The Special Report that prompted the County to adopt the deferral ordinances states: "The [Concurrency Management] Certificate *acts like a 'contract'* with the developer, and by its issuance, *the County agrees that the project can move forward to completion*—irrespective of the possibility that public facilities may become inadequate before the project is ready for recordation." Unrebutted testimony established that the County's Director of Planning, in a slide presentation to homebuilders discussing the concurrency management process (prior to the adoption of the Deferral Ordinance) stated: "A housing allocation *reserves a developer the right* to receive a building permit in that fiscal year." (Internal citations omitted.)

The CMCs expressly stated that the Projects satisfied then existing APF requirements. On that basis, the County clearly agreed to "issue building permits for the subdivision." When read together with the milestones schedule, the County was obligated to issue particular building permits at specified times, so long as Forty West met the requirements listed in the CMCs.

 At the relevant time, § 167–6.E of the County Code expressly stated: "Once a project has received a concurrency management certificate, no further approval for adequate facilities and services will be required for the project if the project is completed in accordance with its milestones."[24] Of import here, " 'Maryland adheres to the general rule that

---

**24.** As noted, under County Code § 167–6.F, a "failure to meet a milestone shall not result in expiration of a concurrency management certificate in any case where failure to meet a particular milestone was caused by acts or omissions of the county."

parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident.'" *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 344, 731 A.2d 441 (1999) (quoting *Wright v. Commercial & Sav. Bank*, 297 Md. 148, 153, 464 A.2d 1080(1983)). Thus, the CMCs must be construed in light of § 167-6.E of the County Code; it explicitly provided that, upon issuance of a CMC, the County will not require additional APF approval. Neither the CMCs nor the County Code created an exception to this language allowing the County to impose new standards by changing the law and applying it retroactively.

Appellant points to several matters not addressed by the CMCs, to suggest that the promises contained within the CMCs are not enforceable. These include:

"[T]he CMC created no rights to a development approval or the processing of development approvals by the Board within any specific period of time"

"Adequate public facilities testing . . . does not guarantee approval of any specific number of lots"

"[B]y issuance of a CMC, the County did not guarantee issuance of a specific number of permits by a specific date." [based on testimony]

"[T]he issuance of the CMC . . . did not constitute approval of a preliminary subdivision plan."

"The CMC did not include provisions or language that reflected . . . a guarantee of preliminary subdivision approval by the Commission of the same number of lots as the housing allocation."

The Board's contractual duties under CMCs are no less clear and definite simply because the CMCs do not regulate every detail of the development process. As the Court has said, "A contract is not rendered unenforceable merely because the parties do not supply every conceivable detail or anticipate every contingency that may arise."

*Scheffres v. Columbia Realty Co., Inc.*, 244 Md. 270, 285, 223 A.2d 619 (1966) (citations omitted). In effect, appellant would have us overlook the definite obligation the CMCs imposed on the County—to refrain from applying new public facilities requirements to the Projects—merely because the CMCs did not control every aspect of the development process. We decline this invitation.

The Board also insists that a CMC is not a contract but it is, instead, "a staff-generated form"; "a 'fill in the blanks' generic form"; "nothing more than a 'written determination' of available threshold capacity"; "an approval required of almost all residential developers before a subdivision plan could be filed"; and "merely a 'determination' as defined in the CML § 167–2." This blizzard of descriptions is not persuasive: a writing can be all of these things and still constitute a contract, so long as it contains the essential elements of a contract. Moreover, the Board's list of descriptive labels for CMCs raises the question of why it would execute CMCs, under seal, if the CMCs were not intended to have any operative or binding effect.

To support its position, the Board further relies on the following language from 5 McQuillin, *Municipal Corporations,* § 19.39 (emphasis added by Board):

> Moreover an ordinance that is a mere permission or at most an administrative act ... *is not a contract* within the meaning of the constitutional prohibition against impairing the obligation of a contract. The same is true of a permit, such as a building permit, and withdrawing it after granting it does not imp air contract obligations. Similarly, a grant of a certificate of public convenience and necessity to operate busses [sic] under municipal license is not a contract.

As we see it, this language does not apply here because it does not refer to CMCs. While issuance of a building permit or similar license, without more, ordinarily does not contractually bind a municipality, this is only a general rule. By suggesting otherwise, the Board adheres to a formalistic theory of contracts that finds its fullest expression in the Board's

insistence that "the CMC was not a contract Nowhere within the CMC was the word 'contract' or similar descriptive wording used."

Appellant also argues that the CMCs were not contracts because they lacked consideration. It maintains that the word "seal" next to the signatures on the CMCs "did not amount to consideration" for the alleged "contract." The word "seal," it argues, was evidence of the Director of Planning's "delegated corporate authority to issue a CMC. Appellant further contends that Forty West did not tender anything of value to the County, in contrast to prior decisions finding that a government extended a contract or vested contractual interest to a landowner.

In addition, the Board maintains that the word "seal" was not intended to establish consideration, but only to show that the CMCs were executed by one acting under the Board's authority. Appellant asserts in its brief, "the use of the word seal is evidence of the Director of that Department's delegated corporate authority to issue a CMC." It relies on the following language from *Tipton v. Partner's Management Co.,* 364 Md. 419, 432, 773 A.2d 488 (2001):

> The rule as explained in *General Petroleum [v. Seaboard Terminals Corp.,* 23 F.Supp. 137 (D.Md.1938) ] is the general rule that applies in instances where a corporate seal is affixed to a document. Because there is a separate and distinct purpose for the affixing of a corporate seal to a document, *i.e.,* it may be evidence of corporate authority for the execution of the document, then there must be other evidence establishing that the corporation intended for the document to be a specialty in order for the twelve-year limitation period to apply. The mere affixing of the corporate seal may not be enough.

Forty West responds:

> The County's suggestion that the seals were there only to indicate "evidence of corporate authority" has two flaws: (1) it begs the question why evidence of Forty West's corporate authority was needed in the first place, since Forty West

was allegedly offering no consideration, and therefore was doing nothing that would required corporate authority, and (2) it assumes that evidence of the County's own authority to execute the document was needed, which is a mystery if the County was not committing itself to anything, as the County argues on this appeal. The County fails to grasp the significance of execution under seal. As the Court of Appeals stated in *Twining [v. National Mort. Corp.,* 268 Md. 549, 554, 302 A.2d 604 (1973) ], "The common law has never required a consideration in contracts under seal, but has enforced them because they were held to be the deliberate engagements of the parties making them." If ever there was a "deliberate engagement" between two parties, the CMCs qualify for that characterization.

(Internal citations omitted.)

In any event, Forty West maintains that it did provide consideration for the CMCs. It claims that the "benefits" gained by the County "in the form of new housing and resultant tax revenues" is consideration. Moreover, it contends that, "by promising to refrain from imposing further APF review after a CMC is issued, the County encouraged developers to do exactly what Forty West did in this case, namely, purchase land in the County and expend significant monies to develop that land, for the ultimate benefit of the citizens of Carroll County."

To be binding and enforceable, contracts ordinarily require consideration. *Cheek v. United Healthcare of Mid–Atlantic, Inc.,* 378 Md. 139, 147, 835 A.2d 656 (2003); *see Harford County v. Town of Bel Air,* 348 Md. 363, 381–82, 704 A.2d 421 (1998)(citing *Beall v. Beall,* 291 Md. 224, 229, 434 A.2d 1015 (1981)); *Broaddus v. First Nat. Bank of Hagerstown,* 161 Md. 116, 121, 155 A. 309 (1931). *See also Chernick v. Chernick,* 327 Md. 470, 479, 610 A.2d 770 (1992) (binding contracts "must be supported by consideration"); *Peer v. First Federal Savings and Loan Assoc. of Cumberland,* 273 Md. 610, 614, 331 A.2d 299 (1975) (a binding contract "must be supported by sufficient consideration"). In Maryland, consid-

eration may be established by showing " 'a benefit to the promisor or a detriment to the promisee.' " *Harford County,* 348 Md. at 382, 704 A.2d 421 (quoting *Vogelhut v. Kandel,* 308 Md. 183, 191, 517 A.2d 1092 (1986)).

In *Twining v. National Mortg. Corp.,* 268 Md. 549, 554, 302 A.2d 604 (1973), the Court of Appeals said: "The common law has never required a consideration in contracts under seal, but has enforced them because they were held to be the deliberate engagements of the parties making them." (citing William T. Brantly, *Law of Contract* (2d ed. rev.1922) § 51) (additional citations omitted); *see Conowingo Land Co. of Cecil County, Md. v. McGaw,* 124 Md. 643, 652, 93 A. 222 (1915) ("Inasmuch as the seal imports consideration it could not be properly said that there was no evidence legally sufficient to show any consideration. . . ."); *Roth v. Baltimore Trust Co.,* 161 Md. 340, 349, 158 A. 32 (1931); *Ingersoll v. Martin,* 58 Md. 67, 74 (1882).

 We followed this principle in *Venners v. Goldberg,* 133 Md.App. 428, 435–36, 758 A.2d 567 (2000), explaining:

At common law, a contract signed under seal was a formal obligation that became operative and enforceable upon delivery. (Hence the expression "signed, sealed, and delivered.") Consideration was not an essential element of such a contract, and the contract was valid notwithstanding the absence of consideration. 3 *Corbin on Contracts,* § 10.14, at 397 (1996) ("Corbin"); 1 Williston, *A Treatise on Contracts,* § 2:14, at 125–26 (4th Ed.1990); *Citizens' National Bank v. Custis,* 153 Md. 235, 238, 138 A. 261 (1927). Unless changed by statute, it remains the case that consideration is not necessary for a sealed promise. *See Twining v. National Mortgage Corp.,* 268 Md. 549, 558, 302 A.2d 604 (1973); *Brewer v. Sowers,* 118 Md. 681, 687, 86 A. 228 (1912).

In the past, the concept that consideration is not required to support a contract under seal has been expressed as the seal "importing consideration" or in terms of the seal establishing a conclusive presumption of consideration. *See, e.g., Selby v. Case,* 87 Md. 459, 462, 39 A. 1041 (1898) (observing

that "[a] seal imports consideration; that is to say, it supplies its place and makes a contract as valid as if value had been actually paid and received"). Those phrases are somewhat misleading, however, because, in fact, consideration is irrelevant to the validity of such a contract. The seal did not really "import" consideration, because there was no need for consideration, and consideration was not truly presumed, because its existence was not necessary for the contract to be effective. Corbin, *supra*, § 10.14, at 399.

Moreover, the *Tipton* Court declined to rely on the language cited by the County. It stated, 364 Md. at 433, 773 A.2d 488:

> As far as we can discern, the Court has not heretofore been presented with a case in which arguments were presented that because the use of a seal on conveyancing documents had other purposes, its affixation on such documents, like the use of the corporate seal in corporate instruments, should be treated similarly, instead of an automatic assumption that a specialty was intended.

Having found this question to be one of first impression, the Court declined to reach it, asserting, *id.* at 433–34, 773 A.2d 488 (emphasis added):

> While the affixation of the word seal to real property conveying documents is no longer required for validation purposes, its use remains widespread, we suspect, because of its use and the requirements of its use, historically. Because we are holding that the provisions of the Courts and Judicial Proceedings Article do not apply to establish a twelve-year limitations [sic] period in this case, primarily because of the legislative history of the limitation's statute, *i.e.*, its recodification, *it is unnecessary at this time to answer this interesting question discussed briefly at oral argument and expanded upon in this opinion.* [ ]

Even if the Court had relied on the language cited by appellant, *Tipton* is distinguishable from the case *sub judice* because it did not involve the issue of consideration. *Tipton* addressed whether a sealed lease agreement was a "specialty instrument" within the meaning of C.J. § 5–102, and therefore

governed by a twelve-year statute of limitations. The Court observed: "The use of the word seal on documents involving the conveyance of interests in real property (whether fee simple or lessor interests), has historically had a separate purpose from that involving contracts of a different nature." *Id.* at 425, 773 A.2d 488. The Court cited a contracts treatise noting that a contract by deed *must* be sealed and delivered to be effective: "This is the main distinction between a *deed* and any other contract." *Id.* at 427, 773 A.2d 488.

 We also reject appellant's claim that the CMCs, if they were contracts, were not validly executed due to its failure to follow the procedures set forth in Md.Code, Art. 66B, § 13.01, *et seq.*, pertaining to Development Rights and Responsibilities Agreements ("DRRAs").[25] In particular, appellant argues there was no public hearing or recordation of the CMCs in the County land records.

As Forty West points out, this statute merely empowered counties to adopt, by ordinance, a formalized procedure for the execution of DRRAs; Carroll County did not pass the necessary enabling legislation, however, and so the provisions of Art. 66B, § 13.01, *et seq.* do not apply. Notably, the County does not argue that its failure to pass such legislation prevented it from forming contracts with developers such as Forty West. *See Bollech v. Charles County, Maryland,* 166 F.Supp.2d 443, 454 (D.Md.2001).[26]

## D.

 Even assuming that the CMCs are contracts, appellant argues that the court "failed to discuss in its opinion

---

**25.** DRRAs are defined by Art. 66B, § 1.00(d) as "agreement[s] made between a governmental body of a jurisdiction and a person having a legal or equitable interest in real property for the purpose of establishing conditions under which development may proceed for a specified time."

**26.** 1995 Md. Laws, ch. 562, § 3 provided that "this subtitle may not abrogate existing powers, explicit or implied, exercised by a local government to enter development rights and responsibilities agreements before October 1, 1995."

whether or not there existed a dispute of material fact as to whether those alleged 'contractual obligations' had been breached." It claims that Forty West assumed "that if the projects moved forward under Chapter 71, and were subject to a final adequate public facilities test by the Board, that the projects would fail." They continue:

The only evidence placed before the court on this issue was the testimony of Stephen Costello. Mr. Costello was asked at the July 28, 2004 contempt hearing whether he was concerned about the enactment of Chapter 71. Mr. Costello stated, over objection, that it was his understanding that the projects would fail the final test for APF because the new APF testing would invoke a "functionally-rated" school capacity test as opposed to a "state-rated" school capacity test. Mr. Costello based his understanding on enrollment projections for the Carroll County school districts. Counsel for the Board objected to the use of these enrollment projections because even though they had been "put on the street" by the Board of Education, the Board had not yet adopted its ten-year facility master plan. As a result, the numbers contained in the enrollment projections were not final and had not yet been adopted by the Board of Education. The court overruled counsel's objection and admitted the enrollment projections into evidence.

At the very least, counsel's stated objection to Mr. Costello's reliance on the Board of Education's enrollment projections created a dispute of material fact, particularly since Forty West's entire argument on what "might occur" as a result of the enactment of Chapter 71 rested on Mr. Costello's non-expert opinion as to whether or not the projects would pass a final APF testing. At the same hearing, Bruce Waldron, a Development Review Coordinator, testified for the County. He stated that he was not knowledgeable enough to testify as to whether the enrollment projections would adversely affect the Forty West projects ability to pass APF testing. Later in the hearing, counsel for the Board stated once again that there was no factual predicate to support the admission of the enrollment projections into

evidence. Counsel added, "we really don't know what (the enrollment projections) represents, whether its accurate, whether its inaccurate, whether its to be relied upon or not relied upon."

Appellees counter that the court "had evidence not only that the CMCs contained contractual obligations but that the County would breach those obligations." They posit:

Even prior to the November 2003 Injunction, Judge Galloway heard evidence that the County intended to apply more stringent APF criteria to Forty West's projects than were contained in the existing ordinance. Crediting this testimony would have been particularly apt, in light of the Commissioners' ultimate decisions, which actually applied more stringent criteria even before the ordinance had been changed. Judge Galloway was also entitled to infer, from the fact that the County refused to call Horn to the stand during the October 2003 hearing, to testify about facts peculiarly within his knowledge (the County's intended modifications to the adequate public facilities criteria), that Horn's testimony would have been unfavorable. *Radin v. Supervisor of Assessments of Montgomery County*, 254 Md. 294, 301, 255 A.2d 413 (1969).

As additional evidence of the County's breach, Forty West cites the two letters the County wrote on May 13,2004. These letters, Forty West claims, "took note of the County's recent enactment of Chapter 71 and warned Forty West that enforcement of the ordinance 'may have a direct impact on your proposed subdivision plans as compliance with each ordinance is required.' "

The County's argument assumes that a breach of the CMCs could only take place if the application of Chapter 71 to the Projects required modification or abandonment of the Projects. We disagree. As we see it, the breach occurred in the application of those new APF standards to the Projects.

The County does not refute the May 13, 2004 letters proffered by Forty West, in which the County insisted that compliance with Chapter 71 "is required." The letters were

sufficient evidence to show the County's intent to apply the new APF ordinance to the Projects, in breach of the County's obligations under the CMCs. Even if the Projects survive the new Chapter 71 standards, that would be relevant only to Forty West's damages flowing from the breach, not to the breach itself.

### E.

Appellant argues that the court "erred or abused its discretion when it found Carroll County to be in constructive contempt of its November 13, 2003 Order." The County insists that the November 2003 Order required only that it "resume the development review and approval process" for the Projects.[27] In appellant's view, the court did not, and could not, "prevent the Board from enacting any new development legislation, nor did the court state that the Board was prohibited from applying new legislation to the Forty West projects." Appellant adds, in a footnote:

> If the Court had prohibited the enactment of the new ordinance, the Court's order would have violated the separation of powers doctrine, which states that a court "cannot require the legislature to take action within the scope of its prerogative, by mandamus or otherwise," *Maryland Committee For Fair Representation v. Tawes*, 228 Md. 412, 446, 180 A.2d 656, 674 (1962), citing, *Maryland–National Capital Park & Planning Commission v. Randall*, 209 Md. 18, 290 [120] A.2d 195 (1956) ("[i]t is not within the power of the judiciary to enjoin the legislature from passing a proposed statute or compel it by mandamus to do so.").

The County insists that in a contempt proceeding for the alleged violation of an injunctive order, the terms of the

---

27. We cannot discern the effect of the finding of contempt. No sanctions were imposed, and the injunctive relief granted by the court's October 18, 2005 Memorandum Opinion and Order continued to enjoin the Board from applying to Forty West any APF ordinances or criteria, "other than that which was in force and effect at the time the Concurrency Management Certificates were issued."

injunctive order must be "specific and definite," or else "the defendant will not be punished for contempt." *Rocks v. Brosius*, 241 Md. 612, 648, 217 A.2d 531 (1966). Furthermore, it claims that, "in proceedings to punish for the contempt of an injunctive order or decree ... the courts will not expand the language of the decree by implication beyond the meaning of the terms of the order or decree." *Id.* at 649, 217 A.2d 531. Appellant also asserts: "Before a party may be held in contempt of a court order, the order must be sufficiently definite, certain, and specific in its terms so that the party may understand precisely what conduct the order requires."

According to appellant, after the passage of Chapter 71, when Forty West asked the court to "enter an Order prohibiting the County from requiring any further approval for adequate public facilities[,]" Forty West acknowledged "that the enactment of Chapter 71 was beyond the scope of the court's November 13, 2003 order." Based on the testimony of Costello and Waldron, appellant argues that, "immediately after the November 12, 2003 Order, the County resumed processing the development review and approval process for the two projects."

Forty West responds that if an injunction's terms are sufficiently specific and definite so as to apprise a party of precisely what conduct the order requires, and a party intentionally violates the order, a finding of civil contempt will be upheld on review. *Harford County Educ. Ass'n v. Bd. of Educ. of Harford County*, 281 Md. 574, 588, 380 A.2d 1041 (1977); *see Droney*, 102 Md.App. at 684, 651 A.2d 415. It adds that a party may not "avail himself of various modes of getting around, or under, or over it, without being chargeable with the slightest contempt of the law." *Harford County Educ. Ass'n*, 281 Md. at 586, 380 A.2d 1041 (citation omitted). Moreover, Forty West maintains that, at the July 2004 hearing, it demonstrated that its Projects would not satisfy the new APF standards. Referring to the County's letters of May 13, 2004, as evidence that the County intended to violate the November 2003 Injunction, it asserts:

The letters took note of the County's recent enactment of Chapter 71 and warned Forty West that enforcement of the ordinance "may have a direct impact on your proposed subdivision plans as compliance with each ordinance is required." In response, Forty West's counsel sent letters to the County on May 21, 2004, pointing out that the May 13 letters threatened to place the County in contempt of court. A conference with the County Attorney's office on May 25, 2004, confirmed the County's intention to apply newly enacted APF standards to Forty West's projects.

Turning to the November 2003 Injunction, Forty West argues that the court required the County to resume the review process, and that "[t]he trial judge reasonably concluded that the County's choice to apply new APF standards would lead to the shutdown of processing, inconsistent with the circuit court's prior order to resume processing." Addressing appellant's separation of powers argument, Forty West concedes the County was free to enact the Chapter 71 legislation. But, it maintains that the County was not entitled to apply it retroactively to Forty West's Projects.[28]

 Contempt proceedings in Maryland are governed by the Maryland Rules. *See* Maryland Rules §§ 15–201 through 15–208. A contempt "may be direct and civil, or direct and criminal, or constructive and civil, or constructive and criminal." *Pearson v. State*, 28 Md.App. 464, 481, 347 A.2d 239 (1975); *see Bahena v. Foster*, 164 Md.App. 275, 286, 883 A.2d 218 (2005).

 A " '[d]irect contempt' means a contempt committed in the presence of the judge presiding in court or so near to the judge as to interrupt the court's proceedings." Md. Rule 15–202(b). *See King v. State*, 400 Md. 419, 431, 929 A.2d 169 (2007). Constructive contempt is "any contempt other

---

**28.** In its reply brief, the Board disputes that assertion. It reiterates that the November 2003 Order did not bar it from requiring further approval for adequate public facilities, or from passing Chapter 71 and applying it to the Projects.

than a direct contempt." *Id.* (citing Md. Rule 15–202(a)). *See Smith v. State,* 382 Md. 329, 338, 855 A.2d 339 (2004); *In re Lee,* 170 Md. 43, 47, 183 A. 560, *cert. denied,* 298 U.S. 680, 56 S.Ct. 947, 80 L.Ed. 1400 (1936) ("Indirect or constructive contempts are those which do not occur in the presence of the court, or near it, ... but at some other place out of the presence of the court and beyond a place where the contempt would directly interfere with the proper functioning of the court."); *Dorsey v. State,* 356 Md. 324, 344, 739 A.2d 41 (1999) (noting that constructive criminal contempt proceedings are treated "like other ... actions with regard to the initiation of prosecution, waiver of counsel, waiver of jury trial, and bail"); *see also Arrington v. Dept. of Human Resources,* 402 Md. 79, 93, 935 A.2d 432 (2007) ("A constructive contempt is ... conduct that does not interrupt the order of the courtroom or interfere with the conduct of business and is not within the sensory perception of the judge.")

 Both direct and constructive contempt proceedings may be either civil or criminal in nature. "Civil contempt proceedings [are] 'intended to preserve and enforce the right of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties.'" *Archer v. State,* 383 Md. 329, 345, 859 A.2d 210 (2004) (quoting *State v. Roll and Scholl,* 267 Md. 714, 728, 298 A.2d 867 (1973)); *see Droney v. Droney,* 102 Md.App. 672, 683, 651 A.2d 415 (1995). "Because civil contempt proceedings 'are generally remedial in nature and are intended to coerce future compliance ... a penalty in a civil contempt must provide for purging.'" *Bahena,* 164 Md.App. at 286, 883 A.2d 218 (citation omitted). Civil contempt "need be proved only by a preponderance of the evidence." *Marquis,* 175 Md.App. at 746, 931 A.2d 1164.

 In contrast to civil contempt, "[c]riminal contempt ... constitute[s] 'positive acts which [offend] the dignity or process of the court. Holding an offending party in contempt of court [is] designed to vindicate the authority and power of the court and punish disobedience to its order.'" *Archer,* 383 Md.

at 345, 859 A.2d 210 (quoting *Roll and Scholl,* 267 Md. at 727, 298 A.2d 867); *see King,* 400 Md. at 441, 929 A.2d 169.

Contempt proceedings are "[o]ne weapon in the court's arsenal[,] useful in defending its dignity." *Roll and Scholl,* 267 Md. at 717, 298 A.2d 867 (1973); *accord Marquis v. Marquis,* 175 Md.App. 734, 746, 931 A.2d 1164 (2007); *Bahena,* 164 Md.App. at 286, 883 A.2d 218. However, "one may not be held in contempt of a court order unless the failure to comply with the court order was or is willful." *Dodson v. Dodson,* 380 Md. 438, 452, 845 A.2d 1194 (2004). Moreover, "The order must be sufficiently definite, certain, and specific in its terms so that the party may understand precisely what conduct the order requires." *Droney,* 102 Md.App. at 684, 651 A.2d 415.

The decision to hold a party in contempt is vested in the trial court. *See Bienenfeld v. Bennett–White,* 91 Md. App. 488, 514, 605 A.2d 172, *cert. denied,* 327 Md. 625, 612 A.2d 256 (1992). "This Court will only reverse such a decision upon a showing that a finding of fact upon which the contempt was imposed was clearly erroneous or that the court abused its discretion in finding particular behavior to be contemptuous." *Droney,* 102 Md.App. at 683–84, 651 A.2d 415; *see Bienenfeld,* 91 Md.App. at 514, 605 A.2d 172.

We are satisfied that the court did not err or abuse its discretion in granting Forty West's Petition for Constructive Contempt. The November 2003 Order arose from Forty West's request for an injunction to prevent the County from suspending the approval process for the Projects, pursuant to the Deferral Ordinance. The County had passed the Deferral Ordinance in an effort to postpone residential development, while it developed more restrictive public facilities requirements. The November 2003 Order noted that Forty West was "seeking the continuation of processing of their subdivision plans without the imposition of additional adequate public facilities requirements." In granting Forty West's request for injunction in November 2003, the court effectively determined that the County could not apply stricter public facilities condi-

tions to the Projects in an attempt to delay subdivision approval and issuance of building permits to Forty West. Therefore, it ordered the County to "resume the development review and approval process" for the Projects.

In appellees' subsequent contempt petition, at issue here, they argued that the November 2003 Order required the County to "resume the development review and approval process" pertaining to the Projects. Citing the County's passage of Chapter 71, and its expressed intent to apply new APF requirements to the Projects, Forty West asserted:

This action by the County directly contravenes the Order of November 13, 2003, in that said Order contemplated that the "development review and approval process" would be carried out under the ordinances in effect at the time of the Order. The County's application of new, more stringent APF requirements to [Forty West's] Projects constitutes a *de facto* cessation of the "development review and approval process" contemplated in the Order, and therefore places the County in contempt of court.

The circuit court agreed with Forty West. It ordered that its Petition for Constructive Contempt be granted, and ruled that the County could "purge itself of contempt by continuing to process [the Projects] under Chapter 167 of the Code of Public Laws and Ordinances of Carroll County, the law in effect at the time [the CMCs] for both projects were issued[.]"

In finding the County in contempt of its November 2003 Order, the court properly concluded that the County was yet again attempting to delay approval of the Projects in order to impose, retroactively, more rigorous public facilities requirements. Whether the County sought to accomplish this delay through a second "deferral ordinance," or by applying new, stricter APF standards on the Projects, the effect was the same: approval of the Projects would be held in abeyance.

The court was not required in the November 2003 Order to set forth specifically all possible ways that the County could conceivably suspend or delay approval of the Projects. Nor could the County claim compliance with the Order by tempo-

rarily resuming approval, then suspending the process indefinitely. The November 2003 Order clearly barred the County from using public facilities adequacy as a justification for failing to approve the subdivisions and issue building permits, and the court did not err in finding that appellant violated the November 2003 Order.

## F.

Appellant insists that the award of preliminary injunctive relief was improper. It contends that the circuit court lacked jurisdiction over Forty West's request for additional injunctive relief because Forty West failed to exhaust its administrative remedies.[29] Appellant argues:

On or about December 30, 2004, Forty West filed an Amended Complaint seeking to enjoin the Board from applying Chapter 71 to its projects.[ ] Forty West, which had obtained a Concurrency Management Certificate under the precursor to Chapter 71, Chapter 167, argued that the additional adequate public facilities testing on its projects under Chapter 71 would be unfair and prejudicial. Yet, such a determination would necessitate the review and interpretation of both Chapter 71 and the repealed Chapter 167. This interpretation should not have been made by the circuit court but by the administrative agency most familiar with Chapter 167 and Chapter 71, the Planning and Zoning Commission.

Appellant's brief continues:

Forty West contends that an administrative agency lacks jurisdiction to hear any sort of direct challenge to a legislative act (like the enactment of Chapter 71). (E.253). Forty West, however, has not challenged the enactment of Chapter 71. Instead, Forty West has challenged the administrative decision to apply Chapter 71 to its projects. Even though the enactment of Chapter 71 was a legislative action, the decision to apply Chapter 71 to Forty West's projects

---

**29.** Appellant devotes a scant two and a half pages to this contention.

was an administrative action, and therefore, Forty West was required to exhaust its administrative remedies before seeking relief from the circuit court.

Further, the County asserts: "A claim of failure to exhaust administrative remedies is jurisdictional in nature, and may be raised at any time, including on appeal ... Due to Forty West's failure to exhaust administrative remedies, no justiciable controversy existed before the trial court, and any claim for injunctive relief should have been dismissed."

Appellees respond that "the policies underlying the exhaustion requirement are not implicated here." They argue:

It is because administrative agencies have special expertise in the subject matter of the statutes they interpret that courts defer to their findings and proceedings. *Heery Int'l, Inc. v. Montgomery County*, 384 Md. 129, 137–38, 145, 862 A.2d 976 (2004). Here, however, the contempt proceeding did not involve interpretation of a statute that the agency administers, but interpretation of a court order. Neither the County nor any of its administrative agencies has special expertise in determining whether their own actions have violated an order of the circuit court. Nor does the County Code provide an administrative remedy, such as injunctive relief, for violation of a court order. Clearly the trial court is in the best position to decide, in the first instance, whether a party to a pending lawsuit has shown contempt by intentionally violating the court's express orders.

The grant or denial of an injunction lies within the sound discretion of the trial court. On appeal, we review the trial court's decision for an abuse of discretion. *See Md. Comm'n on Human Relations v. Downey Commc'ns, Inc.*, 110 Md.App. 493, 521, 678 A.2d 55 (1996) (citations omitted).

"Ordinarily, in a case involving an administrative agency action, 'all administrative remedies must be exhausted before a party may seek a declaratory judgment....'" *Young v. Anne Arundel County*, 146 Md.App. 526, 557, 807 A.2d 651 (quoting *Moose v. Fraternal Order of Police, Montgomery County*, 369 Md. 476, 486, 800 A.2d 790 (2002)), *cert.*

*denied,* 372 Md. 432, 813 A.2d 259 (2002); *see Prince George's County v. Ray's Used Cars,* 398 Md. 632, 645–46, 922 A.2d 495 (2007); *Brown v. Fire and Police Employees' Retirement System,* 375 Md. 661, 669, 826 A.2d 525 (2003); *Montgomery County v. Broadcast Equities, Inc.,* 360 Md. 438, 452, 758 A.2d 995 (2000). The adjudicatory administrative process is generally considered to produce "the most efficient and effective results." *Secretary, Maryland Dep't of Human Resources v. Wilson,* 286 Md. 639, 645, 409 A.2d 713 (1979). On the other hand, in the absence of a statutory or administrative remedy, exhaustion is not required; a declaratory action may lie to challenge an administrative ruling. *Cf. Anderson House, LLC v. Mayor and City Council of Rockville,* 402 Md. 689, 705–06, 939 A.2d 116 (2008).

 We agree with Forty West that it was not required to exhaust administrative remedies prior to seeking injunctive relief or a contempt finding. Forty West's argument, which we have accepted, is that Chapter 71 does not apply to the Projects because, under the CMCs, Forty West had already satisfied its APF-related obligations under Chapter 167. Requiring Forty West to submit the Projects to a second APF review process would deprive it of its rights under the CMCs. Thus, exhaustion has no application here, because there is no administrative procedure open to Forty West to achieve the relief it seeks, which is enforcement of its contractual rights under the CMCs and Chapter 167 of the County Code.

According to appellant, the decision to apply Chapter 71 to the Projects is an "administrative decision." This belies the text of Chapter 7 1, which states: *"No development project subject to this chapter may be approved* by the [Planning] Commission *until the project has satisfied the requirements of this chapter."* County Code, § 71–6 (emphasis added). Chapter 71 applies to "Major residential subdivisions" and "Minor residential subdivisions not in the Agricultural District." County Code, § 71–3. Appellant does not argue that the Projects are exempt from Chapter 71 by the statute's terms, or that the Commission has any discretion to refrain from

applying the new APF review process to a project that is submitted to the Chapter 71 process. Nor does Chapter 71 set forth any administrative process for a landowner to follow when the developer correctly maintains that his or her projects are exempt from the ordinance due to an existing contractual relationship between the County and the developer, resulting from the issuance of a CMC. Moreover, Chapter 71 does not provide a remedy for a developer whose plans are denied following adequacy review; the developer's plan is to be "placed in a queue and re-tested on an annual basis." County Code, § 71–6.

Appellant claims there is no showing that Forty West could not meet the new criteria under Chapter 71. This is irrelevant. Even if the County stipulated that the Projects could survive the Chapter 71 review process, it is the submission of the Projects to a second APF-review process, not the end result of that process, that would constitute a violation of the County's duties under the CMCs. We decline to require Forty West to submit its Projects to Chapter 71 review, given its contractual rights, as we recited above, under the CMCs. Presumably, if the CMCs had never been executed, Forty West would have been required to submit the Projects to the Chapter 71 review process. But, Forty West already pursued the administrative APF-approval process under the earlier statutory scheme.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLANT.**